UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ROBERT A.WOOD,

                    Plaintiff,           **MEMORANDUM & ORDER**
                                      08-CV-4197 (DRH) (AKT)

        - against -

THE TOWN OF EAST HAMPTON, TODD H. SARRIS,
individually and in his official capacity, KEVIN SARLO,
individually and in his official capacity, MICHAEL SARLO,
individually and in his official capacity, THE VILLAGE OF
EAST HAMPTON, PAUL RICKENBACH, JR., individually
and in his official capacity, GERRARD LARSEN, JR.,
individually and in his official capacity, MICHAEL
TRACEY, individually and in his official capacity, RICHARD
H. SCHNEIDER, individually and in his official capacity, and
JULIO MARIO GALEANO, individually and in his official
capacity,

                    Defendants.
-------------------------------------------------------------X
**A P P E A R A N C E S :**

**For the Plaintiff:**
**THE LAW OFFICE OF STEVEN A. MORELLI, P.C.**
1461 Franklin Avenue
Garden City, New York 11530
By: Eric S. Tilton, Esq.

**For the Defendants Village of East Hampton,**
**Michael Tracey, Richard H. Schneider and**
**Julio Mario Galeano:**
**DEVITT SPELLMAN BARRETT, LLP**
50 Route 111
Smithtown, New York 11787
By: Jeltje de Jong, Esq.
     Kelly E. Wright, Esq.

**HURLEY, Senior District Judge:**

          Plaintiff Robert A. Wood ("Plaintiff") commenced this action against defendants

Town of East Hampton (the "Town"), Todd H. Sarris ("Sarris"), Michael Sarlo, Kevin Sarlo,

Gerrard Larsen, Jr. ("Larsen"), Village of East Hampton (the "Village"), Paul Rickenbach, Jr. ("Rickenbach"), Michael Tracey ("Tracey"), Richard H. Schneider ("Schneider"), and Julio Mario Galeano ("Galeano") (collectively, the "Defendants"), asserting federal causes of action pursuant to 42 U.S.C. §§ 1983, 1985 & 1986, and state law causes of action for false arrest and imprisonment, malicious prosecution, and intentional infliction of emotional distress. Plaintiff alleges that he was continually harassed by the Defendants, and that the harassment culminated in the arrest and subsequent institution of criminal proceedings against Plaintiff. The Village, Tracey, Schneider and Galeano (collectively, the "Village Defendants"), have moved for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons that follow, the Village Defendants' motion is granted in part and denied in part.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local Civil Rule 56.1 Statements, are undisputed unless otherwise noted. Plaintiff was employed by the Town of East Hampton Police Department from 1985 until November 30, 2007, and was a sergeant at the time of his retirement. (Defs.' R. 56.1 Stmt. ¶¶ 1, 2.) Plaintiff claims that he was forced to retire as a result of "the damage Defendants caused to his reputation and career." (Pl.'s R. 56.1 Counterstmt. ¶ P2.1.) Sarris was the Town's police chief and, as such, was the highest ranking member of the Town's police department. (Compl. ¶ 8.) Kevin Sarlo was the Town's police captain and, as such, was the "third highest ranking member of the Town Police Department." (*Id.* ¶ 9.) Michael Sarlo was a lieutenant in the Town's police department. (*Id.* ¶ 10.) Rickenbach was the mayor and a trustee of the Village. (*Id.* ¶ 11.) As the mayor, Rickenbach was the "highest ranking member of the Village." (*Id.*) Larsen was the chief of the Village's

police department and, as such, was "the highest ranking member of the Village Police Department." (*Id.* ¶ 12.) Tracey was the Village's police captain and, as such, was the "second highest ranking member" of that department. (Compl. ¶ 13.) Schneider was a lieutenant in the Village's police department. (*Id.* ¶ 14.) Galeano was a Village police officer. (*Id.* ¶ 15.) It is alleged that Sarris, Kevin Sarlo and Michael Sarlo were "high-ranking official[s] within the Town" who were "policymaker[s] for the Town," and who were responsible for the Town's administration and operation. (*Id.* ¶¶ 8, 9, 10.) Similarly, it is alleged that Rickenbach, Larsen, Tracey and Schneider were high-ranking members or officials within the Village who were "policymaker[s] for the Village," and who were responsible for the Village's administration and operation. (*Id.* ¶¶ 11, 12, 13, 14.) It is further alleged that Galeano was "a policymaker for the Village." (*Id.* ¶ 15.)

Plaintiff learned through the newspaper and common knowledge that the Village "tracked the behavior and/or presence" of Hispanic individuals. (Defs.' R. 56.1 Stmt. ¶ 3.) However, Plaintiff "disagreed with the Village's alleged policy of 'harassing Hispanic citizens under the color of law and the guise of a legal investigation.' " (*Id.* ¶ 4.) Because the Town and Village shared the same radio frequencies, Plaintiff was "aware of traffic over the radio and would hear plates getting run and [knew] that . . . [the Village Police] were at the train station checking up on Hispanics." (*Id.* ¶ 5.) Plaintiff claims that the Village and Town no longer share the same radio frequencies, but the Town maintains the ability to monitor, scan and transmit to other departments on separate radio channels. (Pl.'s R. 56.1 Counterstmt. ¶ P5.1.) Plaintiff further claims that if Town and Village police officers meet, and the Village "keeps running data or . . . there is a radio in the room, the Town officer will hear the traffic coming over the radio."

(*Id.*)

On two separate occasions, Plaintiff visited Rickenbach in his office to discuss Larsen's conduct. (Defs.' R. 56.1 Stmt. ¶ 6.) Plaintiff complained to Rickenbach that Larsen was publicly dating Plaintiff's wife, and that Larsen was using his official vehicle, a Dodge Durango, while doing so. (*Id.*) According to Plaintiff, during the first meeting, Rickenbach stated that he would "not get[ ] involved in a personal matter and that he would look into the other things." (Pl.'s R. 56.1 Counterstmt. ¶ P6.1.) Plaintiff further claims that at some point prior to the finalization of Plaintiff's divorce, "Larsen and Tracey responded to a call from [Plaintiff's wife] to . . . Larsen, reporting that an incident had taken place at the home of Plaintiff." (*Id.* ¶ P6.2.) According to Plaintiff, although Larsen appeared "in a civilian capacity," he was wearing his uniform. (*Id.*) Plaintiff further states that Larsen went into his home while Tracey remained in Plaintiff's garage. (*Id.*) Plaintiff states that "[s]hortly thereafter, Larsen returned to the garage, but had changed clothes, although Tracey did not see him enter the home with any clothes." (*Id.* ¶ P6.3.) Plaintiff further states that "Tracey testified that it was his belief that Larsen was upset that Plaintiff was not arrested at [that] time, and that Larsen indicated he believed Plaintiff should have been arrested." (*Id.* ¶ P6.4.)

Plaintiff identified the black Dodge Durango with tinted privacy glass and a small radio antenna attached to a rear side window as the Chief's vehicle. (Defs.' R. 56.1 Stmt. ¶ 7.) Plaintiff "indicated he knew the Durango when he saw it and he saw it often." (*Id.* ¶ 8.) Plaintiff states that he "often saw the Chief's car outside of his house" and that he mentioned that to Rickenbach "because he did not understand why the Chief's car was outside of his house when he did not live in the Village." (Pl.'s R. 56.1 Counterstmt. ¶ P8.1.)

On August 23, 2007, Plaintiff went to Waldbaums, parking his car at a bank that was up the road from Waldbaums. (Defs.' R. 56.1 Stmt. ¶ 9.) After exiting from Waldbaums, Plaintiff noticed Larsen's black Dodge Durango. (*Id.*) Although the Village Defendants state that Plaintiff "was between 20 and 40 feet from the Durango when he first observed it" and that, at that time and place, Plaintiff "thought that Gerrard Larsen was in the vehicle" (Defs.' R. 56.1 Stmt. ¶ 10), Plaintiff states that he averred "that he was approximately 35 to 40 feet from the Dodge Durango" (Pl.'s R. 56.1 Counterstmt. ¶ P10). Plaintiff was offended because he believed that Larsen was in the Dodge Durango and was following him. (Defs.' R. 56.1 Stmt. ¶ 11.) After Plaintiff saw the Dodge Durango, he observed two Hispanic men sitting on a fence whom he did not recognize. (*Id.* ¶ 12.) For no reason, Plaintiff blurted out, "Policia, black car down there." (*Id.* ¶¶ 13, 14.) Plaintiff states "that he did not make a cognitive decision to say something to the two men and he did not say it for any particular reason." (Pl.'s R. 56.1 Counterstmt. ¶ P14.1.) "One of the Hispanic individuals was defendant Galeano, an undercover Village police officer." (Defs.' R. 56.1 Stmt. ¶ 15.) According to Plaintiff, the Suffolk County District Attorney's Office disclosed that the other Hispanic individual was not a suspect. (Pl.'s R. 56.1 Counterstmt. ¶ P15.1.) Plaintiff additionally claims that "[d]uring Galeano's conversation with the individual, he did not offer to sell him drugs, drugs were never brought up in the conversation, and he was never a suspect." (*Id.* ¶ P15.2.)

A misdemeanor information was filed on August 24, 2007 charging Plaintiff with a violation of New York Penal Law § 195.05 for Obstructing Governmental Administration in the Second Degree. (Defs.' R. 56.1 Stmt. ¶ 16.) That same day, an arrest warrant was issued for Plaintiff. (*Id.* ¶ 17.) Plaintiff "received a phone call from Lt. Richard Schneider on a Friday

5

advising that it was the Village's position that [Plaintiff] had committed obstruction of governmental administration and they were initiating an action to arrest him, and he requested that he come in and turn himself in." (*Id.* ¶ 18.) Plaintiff states that he also "had several phone conversations with people from the police department who urged him to come in to straighten everything out, but [Plaintiff] repeatedly told them he would not come in until he had an attorney with him." (Pl.'s R. 56.1 Counterstmt. ¶ P18.1.) While the Village Defendants claim that Plaintiff engaged in a series of phone conversations with Schneider, Tracey, Sergeant Duetschman, and others, during which conversations those individuals encouraged Plaintiff to "turn himself in over that weekend" (Defs.' R. 56.1 Stmt. ¶ 19), Plaintiff claims that "there were a litany of calls made to him over the course of that weekend" and he could not remember with certainty from whom he received the calls (Pl.'s R. 56.1 Counterstmt. ¶ P19). The Village Defendants argue that Plaintiff also failed to return phone calls from his employer, the Town Police Department, that weekend. (Defs.' R. 56.1 Stmt. ¶ 20.) Plaintiff, on the other hand, argues that he "continuously received phone calls from different people at the police department asking him to turn himself in" and that he "repeatedly told them that he did not want to come in until he obtained representation." (Pl.'s R. 56.1 Counterstmt. ¶ P20.) Plaintiff further argues that because the phone calls did not cease, he stopped answering the phone calls, and he listened to the phone messages on Monday morning. (*Id.*) "On the following Tuesday or Wednesday, [Plaintiff] retained counsel and agreed to turn himself in." (Defs.' R. 56.1 Stmt. ¶ 21.)

"On or about August 28, 2007, [Plaintiff] was arrested for obstruction of governmental administration." (*Id.* ¶ 22.) Plaintiff's attorney went with him to the Village's police station where he was then processed. (*Id.* ¶ 23.) After being processed, Plaintiff was

arraigned at East Hampton Town Justice Court and subsequently released on his own recognizance. (*Id.*) Plaintiff states that his attorney "was not by his side during the entire time [Plaintiff] was being processed." (Pl.'s R. 56.1 Counterstmt. ¶ P23.) Plaintiff further states that he believed that his attorney had "arrange[d] for him to be released on an appearance ticket, but instead he was arraigned," and that Plaintiff had been in a "state of confusion" as a result of "suffering from anxiety" and "sleeping erratically." (*Id.* ¶ P23.1.)

A press release was issued after Plaintiff's arrest. (Defs.' R. 56.1 Stmt. ¶ 38.) Generally, press releases were issued upon every arrest. (*Id.*) While most press releases were generated based upon arrest reports, special press releases would issue for anything "unusual or out of the ordinary." (*Id.*)

On October 3, 2007, Plaintiff was indicted by a grand jury. (*Id.* ¶ 24.) In the criminal court, Plaintiff moved to dismiss the indictment because the prosecution failed to provide the Grand Jury with *Brady* material consisting of a prior disciplinary action against Galeano. (*Id.* ¶ 25.) The court dismissed the indictment, with leave to resubmit, because it found that "the *Brady* material directly involved the credibility of Galeano." (*Id.*) Plaintiff states that "[t]he indictment was dismissed on May 16, 2008, by the County Court for the County of Suffolk on [Plaintiff's] motion based in part upon the fact that the indictment was obtained in violation of [Plaintiff's] constitutional rights to a fair presentment of the facts to the grand jury." (Pl.'s R. 56.1 Counterstmt. ¶ P25.1.) The charge was not resubmitted to the Grand Jury. (Defs.' R. 56.1 Stmt. ¶ 26.)

According to Plaintiff, "[t]he Village hid from the Suffolk County District Attorney . . . substantial evidence about Officer Galeano's motive for bringing the Information

against [Plaintiff] and having him arrested" and that, as a result, the Grand Jury did not hear that evidence. (Pl.'s R. 56.1 Counterstmt. ¶ P25.2.) Plaintiff states that "Galeano had [a] motive to salvage his career after an incident that occurred on December 30, 2006." (*Id.* ¶ P25.3.) The parties agree that, "at some point in time prior to [Plaintiff's] arrest," Galeano had "received [a] 'command discipline' in connection with failing to arrest a person he pulled over for DWI because the individual was a friend of his." (Defs.' R. 56.1 Stmt. ¶ 36.) Plaintiff states that "[t]he charges against Galeano were in 2007, the same year as the incident and arrest of [Plaintiff]." (Pl.'s R. 56.1 Counterstmt. ¶ P36.1.) Plaintiff further states that "Galeano lied about the incident when he was questioned," and, "[a]s a result, Galeano was charged, but [the matter] was ultimately resolved before it [went] to a hearing." (*Id.* ¶ P25.4.) The parties agree that Galeano had been penalized thirty days of vacation time. (Defs.' R. 56.1 Stmt. ¶ 36.)

Galeano had been a Village police officer since approximately 2004. (*Id.* ¶ 27.) "On August 23, 2007, Galeano was assigned to plainclothes surveillance to investigate a tip that there were people doing drugs in the train station of East Hampton and in Herrick Park." (*Id.* ¶ 28.) Galeano was given the assignment because he spoke Spanish, which was the same language spoken by the majority of people that were around the train station and park. (*Id.*) Plaintiff claims that the "tip came from Galeano who [had been] participating in the ongoing police operation." (Pl.'s R. 56.1 Counterstmt. ¶ P28.) According to Plaintiff, Larsen testified that the police would conduct undercover operations at the train station about every six months so as to "confirm what was going on there in regard to people picking up people to employ them illegally" and "to justify what [the police] were doing with the IRS and the ICE and New York Department of Labor." (*Id.*) Galeano had performed that kind of surveillance numerous times

before.  (Defs.' R. 56.1 Stmt. ¶ 29.)

Galeano observed Plaintiff walking to Waldbaums, so Galeano "put his head down" because he did not want Plaintiff to recognize and greet him.  (*Id.* ¶ 30.)  Although Plaintiff walked past Galeano on his way into the supermarket without incident, on his way out, Plaintiff said, "The policia." (*Id.* ¶ 31.)  Plaintiff denies the Village Defendants' claim that Plaintiff "gestur[ed] with his head toward the Durango."  (Pl.'s R. 56.1 Counterstmt. ¶ P31.)

Subsequently, "Galeano met with a detective and advised what had happened." (Defs.' R. 56.1 Stmt. ¶ 32.)  At the time of the surveillance, Galeano had been wearing a wire, and its recording confirmed what Plaintiff had said.  (*Id.*)  Galeano gave a statement about the events and signed a "court information for obstruction of governmental administration."  (*Id.* ¶ 33.)

At the time of the event involving Plaintiff, Tracey, who had been employed by the Village for approximately 25 years, was a captain of the Village's police department.  (*Id.* ¶¶ 34, 35.)  Plaintiff argues that "[i]mmediately after the incident with [Plaintiff], Captain Tracey advised the Mayor and the men not to discuss the issue with Chief Larsen, because he knew that Larsen's involvement would lead to an accusation of impropriety due to his relationship with [Plaintiff]."  (Pl.'s R. 56.1 Counterstmt. ¶ P36.2.)  According to Plaintiff, Tracey testified that if he allowed Larsen to become involved in the charges against Plaintiff, it would "taint the case." (*Id.* ¶ P36.3.)  Plaintiff claims that Larsen was Tracey's boss, and they sat "immediately next to each other," and each could hear what was going on in the other's office.  (*Id.* ¶ P36.4.)

It is Plaintiff's contention that Larsen "was aware of charges against [Plaintiff] at some point prior to [Plaintiff's] arrest, and [Larsen] discussed the incident with Tracey via

telephone on August 25, 2007." (*Id.* ¶ P36.5.)  Plaintiff further contends that Rickenbach testified that Larsen was the individual who told him about the incident involving Plaintiff and Galeano.  (*Id.* ¶ P36.6.)  According to Plaintiff, "[o]n at least one occasion," Larsen told Galeano that Galeano had done "a good job in reference to [Plaintiff's] arrest," and that Larsen "may have done so the day after [Plaintiff's] arrest."  (*Id.* ¶ P36.7.)  In addition, Plaintiff argues that Galeano testified that Larsen spoke with Galeano in the hallway of the police station a few days after Plaintiff's arrest and told Galeano that Galeano "did what [he] had to do."  (*Id.* ¶ P36.8.)

Larsen was employed by the Village's police department for more than 24 years, and he had become the Chief of the department in 2003.  (Defs.' R. 56.1 Stmt. ¶ 37.)  As the Chief, Larsen was assigned an unmarked, black Dodge Durango vehicle.  (*Id.*)  Plaintiff states that Larsen had been reprimanded for using his Dodge Durango police vehicle for his personal use.  (Pl.'s R. 56.1 Counterstmt. ¶ P37.1.)

## DISCUSSION

### I.      *Summary Judgment Standards*

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a matter of law.  *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the

pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an

essential element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.    *Plaintiff Raises a Genuine Issue of Material Fact as to His Fourth Amendment Claim for False Arrest*

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures . . . is substantially the same as a claim for false arrest under New York law." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996) (internal citations omitted). "The common law tort of false arrest is a species of false imprisonment . . . [and] [u]nder New York law, the elements of a false imprisonment claim are: '(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged.' " *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)). The existence of probable cause to arrest negates the final element, *Harris v. County of Nassau*, 581 F. Supp. 2d 351, 355 (E.D.N.Y. 2008) (citing *Caldarola v. Calabrese*, 298 F.3d 156, 161 (2d Cir. 2002)), and " 'is a complete defense to an action for false arrest,' whether that action is brought under state law or under § 1983," *Weyant*, 101 F.3d at 852 (citation omitted) (quoting *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir.1994)). "In general, probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is

committing a crime." *Weyant*, 101 F.3d at 852 (citing *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979)). The probable cause determination is based upon "those facts available to the officer at the time of the arrest and immediately before it." *Caldarola*, 298 F.3d at 162 (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569 (2d Cir. 1996)) (internal quotation marks omitted).

The Village Defendants argue that Plaintiff's claim for false arrest must be dismissed because Plaintiff was arrested pursuant to a valid warrant, and, in addition to the existence of a valid warrant, the police had probable cause to arrest Plaintiff on the ground of Obstruction of Governmental Administration in the Second Degree as well as on the ground of Disorderly Conduct. (Defs.' Mem. at 7-11.) The Court will address each of these arguments in turn.

### A. *Arrest Pursuant to a Valid Warrant*

Plaintiff and the Village Defendants agree that "[a] finding of probable cause to issue a warrant creates a presumption that probable cause existed, which can only be rebutted through proof of fraud, perjury or misrepresentation or falsification of evidence." (Pl.'s Mem. at 5). *See also Fabrikant v. French*, 691 F.3d 193, 214 (2d Cir. 2012) ("Ordinarily, an arrest or search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause.") (citation and internal quotation marks omitted); *Cogswell v. Cnty. of Suffolk Deputy Sheriff's Dep't.*, 375 F. Supp. 2d 182, 187 (E.D.N.Y. 2005) ("[A]n arrest pursuant to a valid warrant is presumptively made with probable cause.") (citation and internal quotation marks omitted).

The parties also do not dispute that an arrest warrant was issued for the arrest of Plaintiff. However, Plaintiff argues that the presumption of probable cause created by the

issuance of the arrest warrant has been rebutted by "evidence that the Defendants had a motive to falsify their claim against Plaintiff." (Pl.'s Mem. at 5.) The Village Defendants argue in response that Plaintiff "has introduced absolutely no proof that there was fraud, perjury or misrepresentation of evidence at the time the warrant was obtained" and that Plaintiff's argument that the Village Defendants had a motive to falsify charges against Plaintiff does not suffice to rebut the presumption of probable cause. (Defs.' Reply at 2-3.) The Court agrees with the Village Defendants on this point. Plaintiff's claim that the Village Defendants had a motive to falsify charges, without more, does not constitute "proof of fraud, perjury or the misrepresentation or falsification of evidence" sufficient to rebut the presumption of probable cause created by the issuance of a valid warrant for arrest. *Artis v. Liotard*, 934 F. Supp. 101, 103 (S.D.N.Y. 1996).

Nevertheless, the issuance of the arrest warrant in this case does not provide a basis for dismissal of Plaintiff's claim for false arrest because the arrest warrant itself was not supported by probable cause, and, therefore, was invalid. The undisputed facts establish that he arrest warrant was issued on the ground of Obstructing Governmental Administration in the second degree, a violation of New York Penal Law § 195.05. That law provides:

> A person is guilty of obstructing governmental administration when he intentionally obstructs, impairs or perverts the administration of law or other governmental function or prevents or attempts to prevent a public servant from performing an official function, by means of intimidation, physical force or interference, or by means of any independently unlawful act, or by means of interfering, whether or not physical force is involved, with radio, telephone, television or other telecommunications systems owned or operated by the state, or a county, city, town, village, fire district or emergency medical service or by means of releasing a dangerous animal

under circumstances evincing the actor's intent that the animal obstruct governmental administration.

N.Y. Penal Law § 195.05 (McKinney 1998). Moreover, in denying the Village Defendants and Larsen's motion seeking dismissal of Plaintiff's false arrest claim, this Court observed in its Memorandum & Order dated September 30, 2010:

> Because the Village Defendants and Larsen do not argue that Plaintiff's statement during the August 23, 2007 incident constituted "intimidation," or an "independently unlawful act," and because neither interference with "radio, telephone, television or other telecommunications systems" nor release of "a dangerous animal" is alleged here, the only remaining question is whether there was probable cause to arrest Plaintiff for obstructing the undercover operation "by means of . . . physical force or interference." N.Y. Penal Law § 195.05.

* * *

> Having considered th[e] case law and accepting as true Plaintiff's allegations as pled in the Complaint, as the Court must on a motion to dismiss, the Court cannot find as matter of law that probable cause existed for Plaintiff's arrest for Obstructing Governmental Administration in the second degree. The Complaint alleges that Plaintiff, while off duty and walking down a Village sidewalk, recognized Larsen's Dodge Durango. He approached two Hispanic individuals who were leaning on a fence against the sidewalk and "attempted to inform them that the Dodge Durango was the police." (Compl. ¶ 59.) Specifically, according to the record before the Court, Plaintiff said "'Policia, over there in the black car' and motioned towards [Larsen's] vehicle." (*Id.*, Ex. A at 2.) Plaintiff did not know that one of the Hispanic men was, in fact, undercover Village Police Officer Galeano. (*Id.* ¶ 60.) When the civilian Hispanic man, who did not speak English, asked Galeano what Plaintiff had said, Galeano provided a verbatim translation of Plaintiff's statement. (*Id.*) The civilian Hispanic man's response was: "We're not doing anything wrong. We're just standing here." (*Id.*, Ex. A at 2.) Immediately after this statement, Galeano, "without identifying himself, walked away from the scene and the narcotics operation was cancelled." (*Id.*)

* * *

Here, there is no indication on the record that Plaintiff had any knowledge that the Village Police Department was conducting an undercover narcotics operation. At most, the Complaint avers that Plaintiff disagreed with the Village Defendants' "policy of harassing and surveilling persons of Hispanic origin under the guise of enforcing immigration and tax laws." (Compl. ¶¶ 57-58.) There is no allegation that anyone or anything effectively defined this particular area of the public sidewalk as an area of police activity, and Plaintiff had received no advanced warnings of that nature. Plaintiff's statement was not directed toward a known area of criminal activity, as was the case in [*In re Davan L.*, 91 N.Y.2d 88, 90 (1997)], or [*People v. Covington*, 18 A.D.3d 65, 65-66 (1st Dep't 2005)]. Plaintiff's conduct here is more akin to the conduct of the plaintiff in [*People v. Hinkson*, 184 Misc. 2d 496, 499 (N.Y.C. Crim. Ct. Kings Cnty. 2000)], or [*People v. Lopez*, 97 Misc. 2d 124, 125 (N.Y.C. Crim. Ct. Bronx Cnty. 1978)], in that he simply warned two individuals standing on a public sidewalk that the police were present. Finally, unlike in *In re Davan L.*, 91 N.Y.2d at 90, Plaintiff's statement did not cause a "physical reaction and dispersal" of anyone other than Galeano who concluded, on his own, that his cover had been blown.

Considering the relevant case law, and after reviewing the factual allegations set forth in the Complaint, it appears that Plaintiff engaged in "purely verbal interference" which could not, on its own, "satisfy the 'physical' component under Penal Law § 195.05." *Id.* at 91. Accordingly, the Court cannot conclude that, as a matter of law, the Village Police Department had probable cause to arrest Plaintiff for the misdemeanor of Obstructing Governmental Administration in the second degree.

(footnotes omitted).

Plaintiff argues that the Village Defendants "appear to concede that there was no probable cause to arrest Plaintiff for the crime with which he was charged." (Pl.'s Mem. at 6.) Plaintiff further argues, "Although the Defendants . . . 'maintain that the police had probable cause to arrest plaintiff under [Penal Law § 195.05] . . . because Plaintiff's version of events establish probable cause,' Defendants offer no new arguments to support their claim despite the Court's decision with respect to the prior motion pursuant to Rule 12." (*Id.* at 6-7 (quoting

Defs.' Mem at 8).)  Since the Court agrees with Plaintiff that the Village Defendants have not come forth with any arguments or evidence to establish that the Plaintiff obstructed the undercover operation through use of physical force or interference, the Court cannot find as matter of law that the arrest warrant for Obstructing Governmental Administration in the second degree was supported by probable cause.  *See Berg v. Cnty. of Allegheny*, 219 F.3d 261, 269-70 (3d Cir. 2000) ("[A]n erroneously issued warrant cannot provide probable cause for an arrest.") (citing *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560 (1971)); *Pitchford v. Borough of Munhall*, 631 F. Supp. 2d 636, 649 (W.D. Pa. 2007) (An  "arrest warrant . . . unsupported by probable cause . . . [is] issued erroneously," and "the issuance of an invalid warrant cannot *itself* provide probable cause for an otherwise unlawful arrest") (citing *United States v. Hensley*, 469 U.S. 221, 231 (1985)).

Furthermore, just as the arrest warrant was not supported by probable cause to arrest Plaintiff for the misdemeanor of Obstructing Governmental Administration in the second degree, based upon the undisputed facts indicating a lack of physical force or interference on the part of Plaintiff at the time of the incident, the police could not reasonably have believed there was probable cause to arrest Plaintiff for Obstructing Governmental Administration.  *See Singer*, 63 F.3d at 119 ("Probable cause is established when the arresting officer has knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested.") (citations and internal quotation marks omitted).  The Court next addresses whether the Village Defendants have demonstrated that there are no genuine issues of material fact that probable cause existed to arrest Plaintiff on the alternative ground of Disorderly Conduct.

### B.    *Probable Cause to Arrest Plaintiff for Disorderly Conduct*

The Village Defendants argue that even if probable cause did not exist to arrest Plaintiff for Obstructing Governmental Administration in the second degree, probable cause existed to arrest Plaintiff for Disorderly Conduct.  The Court must determine if "[t]he record presents questions of fact material to whether [Galeano] could reasonably have believed that [Plaintiff] engaged in disorderly conduct."  *Potenza v. Gonzales*, 2010 WL 2680236, at *3 (N.D.N.Y. July 1, 2010).

The crime of disorderly conduct is defined as follows:

A person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof:

1. He engages in fighting or in violent, tumultuous or threatening behavior; or

2. He makes unreasonable noise; or

3. In a public place, he uses abusive or obscene language, or makes an obscene gesture; or

4. Without lawful authority, he disturbs any lawful assembly or meeting of persons; or

5. He obstructs vehicular or pedestrian traffic; or

6. He congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse; or

7. He creates a hazardous or physically offensive condition by any act which serves no legitimate purpose.

N.Y. Penal Law § 240.20 (McKinney 1965).  In sum, the crime of Disorderly Conduct under New York Penal Law § 240 requires evidence of the following "three elements: (i) the defendant's conduct must [have been] 'public' in nature, (ii) it must [have been] done with

'intent to cause public inconvenience, annoyance or alarm' or with recklessness as to 'a risk thereof,' and (iii) it must match at least one of the descriptions set forth in the statute." *Provost v. City of Newburgh*, 262 F.3d 146, 157 (2d Cir. 2001). Thus, Galeano would have been "warranted in believing that [Plaintiff] had committed or was in fact committing the crime of disorderly conduct, and therefore had probable cause to arrest, only if a reasonable person in the same circumstances would have believed that [Plaintiff's] conduct satisfied all three components of § 240.20." *Id.* (internal citation and quotation marks omitted).

The Village Defendants contend that the first element, i.e., that the conduct was public in nature, has been satisfied because "there was at least five other individuals present besides the officers and [Plaintiff]." (Defs.' Mem. at 10.) The Court agrees that Plaintiff's conduct, which occurred outside Waldbaums on a Village sidewalk, (*see* Defs.' R. 56.1 Stmt. ¶ 9; Compl. ¶ 59), with at least five other individuals present, besides the officers and Plaintiff, was public in nature. *See Provost*, 262 F.3d at 157-58 (finding that conduct which "occurred in [a] police station, [in which] six or seven members of the public were in the waiting room, and . . . a number of police officers were present in the station . . . was sufficiently public to trigger the disorderly conduct statute"). Notably, Plaintiff does not dispute that his conduct was of a public nature.

As to the next element, i.e., the intent requirement, the Village Defendants argue that "Galeano, the undercover officer, was placed in a potentially hazardous situation because if the subject of the investigation realized that he was an undercover officer, he could have been physically harmed." (Defs.' Mem at 9-10.) The Village Defendants additionally argue that "even if [Plaintiff] did not have the subjective intent to cause a hazardous situation, he recklessly

created the risk of same by his conduct." (*Id.* at 10.) Moreover, the Village Defendants assert that "[t]aken as a whole, plaintiff, an officer himself, knew or should have known based on the surrounding circumstances that these persons were the subjects of some sort of police monitoring, and alerting these individuals to the police presences was at a minimum reckless." (Defs.' Reply at 4.)

Plaintiff, on the other hand, argues that he "was unaware, and had no reason to believe, that there was an ongoing police investigation" and that he "simply thought Larsen was intending to follow and harass him, which was reasonable given the history between Larsen and Plaintiff." (Pl.'s Mem. at 9.) In addition, Plaintiff argues that "[h]e did not recognize either of the two individuals he approached . . . and [h]e had no knowledge that one of them was officer Galeano, . . . [and, therefore,] he did not have an intent to cause a hazardous situation." (*Id.*)

Here, the Court finds there is "a fair jury question as to whether [Galeano] lacked probable cause regarding the intent element of the . . . disorderly conduct statute." *Provost*, 262 F.3d at 158 (citation and internal quotation marks omitted). Although Plaintiff's and the Village Defendants' arguments focus primarily on Plaintiff's conduct at the time of the incident, the relevant inquiry in the probable cause analysis focuses on whether a reasonable officer in the same circumstances as Galeano, with the information available to Galeano at the time of the incident, would have believed that Plaintiff had the requisite intent to commit the crime of Disorderly Conduct. *See id.* ("The question, then, is whether 'no reasonable jury could fail to find that [the officer] had probable cause to believe that [the plaintiff] acted without wrongful intent.") (citation and quotation marks omitted); *see also Caldarola*, 298 F.3d at 162 ("When determining whether probable cause exists[,] courts must consider those facts available to the

officer at the time of the arrest and immediately before it.") (citation and internal quotation marks omitted). Notably, the parties do not discuss the knowledge and information that Galeano possessed at the time of the incident other than Galeano's observation that Plaintiff walked up to him and the other Hispanic individual and notified them of the presence of the police. Accordingly, since there is a material issue of fact as to whether Galeano could reasonably have believed that Plaintiff intended to cause public inconvenience, annoyance or alarm, or acted with recklessness as to the risk of causing public inconvenience, annoyance or alarm, and, therefore, there is a material issue of fact as to whether probable cause existed to arrest Plaintiff for the crime of Disorderly Conduct, Plaintiff's claim for false arrest will not be dismissed.[1]

### III. Plaintiff Fails to Raise a Genuine Issue of Material Fact as to His Claim for Violation of the Sixth Amendment Confrontation Clause

To the extent Plaintiff argues, and the Village Defendants agree, that the County Court found that Plaintiff's Sixth Amendment rights were violated when the prosecution failed to provide Brady material during the grand jury hearing, (Pl.'s Mem. at 12; Defs.' Reply at 5), the Court has carefully perused Judge Martin I. Efman's May 16, 2008 Order (the "County Court Order") and has determined that the County Court Order makes no such holding. Indeed, the County Court Order at no time refers to the Sixth Amendment Confrontation Clause much less bases its holding upon it. Moreover, the Court notes parenthetically that "the right to

---

[1] The Court notes that the parties dispute whether the Court may consider if probable cause existed to arrest Plaintiff for the crime of Disorderly Conduct. Specifically, the parties dispute whether the holding in the case *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006), that a court may consider whether probable cause existed to arrest Plaintiff for any crime rather than just the offense charged by the arresting officer, should be applied in this case because this case does not involve a warrantless arrest as did the *Jaegly* case. However, a determination of that issue is unnecessary because the Village Defendants have failed to establish entitlement to summary judgment on the basis that probable cause existed to arrest Plaintiff for Disorderly Conduct in any event.

confrontation is a *trial* right, designed to prevent improper restrictions on the types of questions that defense counsel may ask during cross-examination," and because the criminal case against Plaintiff never proceeded to trial, his right to confront the witnesses before him had not been implicated. *Pennsylvania v. Ritchie*, 480 U.S. 39, 52 (1987). Accordingly, Plaintiff's claim based upon an alleged violation of the Sixth Amendment Confrontation Clause as against the Village Defendants is dismissed.

**IV.**   ***Plaintiff Fails to Raise a Genuine Issue of Material Fact as to His Substantive Due Process Claims***

The Fourteenth Amendment's substantive due process clause protects against governmental deprivations "of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "[T]he touchstone of due process is protection of the individual against arbitrary action of government, whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (internal citations and quotation marks omitted). "[O]nly the most egregious official conduct can be said to be 'arbitrary in the constitutional sense.'" *Id.* at 846 (quoting *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 129 (1992)). The Supreme Court has explained that "the cognizable level of executive abuse of power [is] that which shocks the conscience." *Id.* "The shock the conscience standard is not easily met; the plaintiff must show the government conduct was egregious and outrageous, not merely incorrect or ill-advised." *Schultz v. Inc. Vill. of Bellport*, 2010 WL 3924751, at *6 (E.D.N.Y. Sept. 30, 2010) (quoting *Ferran v. Town of Nassau*, 471 F.3d 363, 369–70 (2d Cir.2006)) (internal quotation marks omitted), *aff'd,* 479 F.

App'x. 358 (2012).

Plaintiff argues that the Village Defendants' conduct was "conscious [sic] shocking," in violation of the substantive due process clause. (Pl.s' Mem. at 17.) Specifically, Plaintiff argues that there is evidence that: Plaintiff's arrest was obtained without probable cause (*Id.*); "Larsen and Tracey, while on duty, responded to a call at Plaintiff's home despite that the call was directed to the *Town* police department and Larsen and Tracey were well outside their jurisdiction" (*Id.* at 18); and "it was . . . well known the [sic] Larsen was romantically involved with Plaintiff's wife" (*Id.*). Additionally, Plaintiff argues there is evidence that "Larsen showed up at Plaintiff's home, wearing his uniform and driving his squad car, even though he was responding to the call in his civilian capacity," and that "he brought Defendant Tracey, also in uniform with him, for the purpose of intimidating and harassing Plaintiff." (*Id.*) According to Plaintiff, "Larsen entered Plaintiff's home, and exited shortly thereafter, in different clothes, even though Tracey did not notice Larsen enter the home with a change of clothes." (*Id.*) Based upon this evidence, Plaintiff argues that "[a] fact finder could find that [the Village Defendants'] abusive action was done with the purpose to harm, harass, and intimidate Plaintiff" and that "[c]learly, this action would shock the conscious [sic]." (Pl.'s Mem. at 18.)

Plaintiff also argues there is "evidence that Defendants leaked his name to the press for the purpose of causing further embarrassment, psychological injury, and reputation damage"; Defendants "hid[] evidence at his grand jury hearing"; and that "Plaintiff was not only arrested, but lost his job, was publicly humiliated and suffered great psychological harm." (Pl.'s Mem. at 18-19.) Finally, Plaintiff asserts that "[t]here is a triable issue of material fact as to whether Defendants targeted Plaintiff and drew up knowingly false accusations against the

23

Defendant with a bare desire to cause Plaintiff harm." (*Id.* at 18.)

Defendants, on the other hand, argue that Plaintiff's arguments, "even if credited as true, are insufficient to establish a violation of the substantive due process clause." (Defs.' Reply at 6.) The Court agrees. Plaintiff's evidence, *inter alia*, that Larsen arrived at Plaintiff's home in full regalia, but left in plain clothes, and that Larsen and Tracey responded to a call at his home even though it was beyond their jurisdiction, simply does not rise to the level of "conscience-shocking" behavior. *Compare Smith ex rel. Smith v. Half Hollow Hills Cent. Sch. Dist.*, 298 F.3d 168, 173 (2d Cir. 2002) (finding that "[s]triking a student without any pedagogical or disciplinary justification" was not conscience-shocking behavior); *Souza v. Pina*, 53 F.3d 423, 425-26 (1st Cir. 1995) (finding no due process violation when a murder suspect committed suicide after prosecutors encouraged the media to link him to a series of murders); *Scotti v. Cnty. of Nassau*, 2005 WL 3670913, at *7-8 (E.D.N.Y. Sept. 13, 2005) (finding that videotaping and visiting disabled correctional officer's home in an attempt to "catch him violating the requirements of his . . . leave" was not "so brutal and offensive to human dignity as to shock the conscience"); *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 361 (S.D.N.Y. 2007) (finding that police officers' conduct of "respond[ing] to plaintiff's residence at the request of her former husband and attempt[ing] to coerce plaintiff to allow [her ex-husband] visitation by threatening her with arrest and the filing of criminal charges against her[, . . . . yell[ing] at and threaten[ing] plaintiff, bang[ing] on doors and windows and, on one occasion, forcibly enter[ing] her home without consent or a warrant" did not shock the conscience), *with Rochin v. California*, 342 U.S. 165, 172 (1952) (finding that the forcible pumping of a suspect's stomach to obtain evidence was conscience-shocking governmental action); *Johnson v. Newburgh Enlarged Sch. Dist.*, 239 F.3d

24

246, 249-52 (2d Cir. 2001) (finding a teacher's violent assault of an eighth grade student, including chocking the student, punching him in the face, and ramming the student's head into bleachers and against a metal fuse box, to be conscience-shocking behavior); *Harrington v. Almy*, 977 F.2d 37, 43-44 (1st Cir. 1992) (requiring a suspended police officer to undergo a penile plethysmograph as a condition of reinstatement was conscience-shocking governmental action).  Since Plaintiff has produced no evidence that the Village Defendants violated his substantive due process rights, his claims on that ground as against the Village Defendants are dismissed.

## V.     *Qualified Immunity*

Defendants Tracey, Schneider and Galeano maintain that they are entitled to summary judgment on the basis of qualified immunity.  "Government actors have qualified immunity to § 1983 claims 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Bolmer v. Oliveira*, 594 F.3d 134, 141 (2d Cir. 2010) (quoting *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 432 (2d Cir. 2009)).  Thus, "[a] qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Salim v. Proulx*, 93 F.3d 86, 89 (2d Cir. 1996).

"Qualified immunity shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial, lawsuits." *Lennon v. Miller*, 66 F.3d 416,

420 (2d Cir. 1995). A court may grant summary judgment on qualified immunity grounds "if [the movant] adduces sufficient facts such that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiffs, could conclude that it was objectively unreasonable for the [movant] to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Hartline v. Gallo*, 546 F.3d 95, 102 (2d Cir. 2008) (citation and internal quotation marks omitted). Qualified immunity is an affirmative defense. As such, the burden of proof rests on the defendants asserting the defense to demonstrate that it was objectively reasonable to believe that their conduct did violate a federal right of Plaintiffs. *See Green v. City of New York*, 465 F.3d 65, 83 (2d Cir. 2006).

Genuine issues of fact remain at this stage regarding whether it was objectively reasonable for Tracey, Schneider and Galeano to believe that probable cause existed to arrest Plaintiff. As such, the genuine issues of material fact that preclude an award of summary judgment dismissing Plaintiff's false arrest claim likewise preclude granting Tracey, Schneider and Galeano qualified immunity at this juncture.

*CONCLUSION*

For the reasons stated above, summary judgment is granted to the Village

Defendants on Plaintiff's Sixth Amendment Confrontation Clause and substantive due process

claims, and denied to the Village Defendants as to Plaintiff's Fourth Amendment claim for false

arrest.

**SO ORDERED.**

Dated: Central Islip, New York
        January 7, 2014                  _____/s/_____
                                         Denis R. Hurley
                                         United States District Judge