UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
ROBERT A. WOOD,

                           Plaintiff,                       **MEMORANDUM & ORDER**
                                                                                             08-CV-4197 (DRH) (AKT)

          - against -

THE TOWN OF EAST HAMPTON, TODD H. SARRIS,
individually and in his official capacity, KEVIN SARLO,
individually and in his official capacity, MICHAEL SARLO,
individually and in his official capacity, THE VILLAGE OF
EAST HAMPTON, PAUL RICKENBACH, JR., individually
and in his official capacity, GERRARD LARSEN, JR.,
individually and in his official capacity, MICHAEL
TRACEY, individually and in his official capacity, RICHARD
H. SCHNEIDER, individually and in his official capacity, and
JULIO MARIO GALEANO, individually and in his official
capacity,

                           Defendants.
-----------------------------------------------------------------X
**A P P E A R A N C E S :**

**For the Plaintiff:**
**THE LAW OFFICE OF STEVEN A. MORELLI, P.C.**
1461 Franklin Avenue
Garden City, New York 11530
By: Eric S. Tilton, Esq.

**For Defendant Gerrard Larsen:**
**AHMUTY, DEMERS & McMANUS, ESQS.**
200 I.U. Willets Road
Albertson, New York 11507
By: Robert J. Hindman, Esq.

**HURLEY, Senior District Judge:**

        Plaintiff Robert A. Wood ("Plaintiff") commenced this action against defendants

Town of East Hampton (the "Town"), Todd H. Sarris ("Sarris"), Michael Sarlo, Kevin Sarlo,

Gerrard Larsen, Jr. ("Larsen"), Village of East Hampton (the "Village"), Paul Rickenbach, Jr.

("Rickenbach"), Michael Tracey ("Tracey"), Richard H. Schneider ("Schneider"), and Julio

Mario Galeano ("Galeano") (collectively, the "Defendants"), asserting federal causes of action pursuant to 42 U.S.C. §§ 1983, 1985 & 1986, and state law causes of action for false arrest and imprisonment, malicious prosecution, and intentional infliction of emotional distress. Plaintiff alleges that he was continually harassed by the Defendants, and that the harassment culminated in the arrest and subsequent institution of criminal proceedings against Plaintiff. Larsen now moves for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. For the reasons that follow, Larsen's motion is denied.

## BACKGROUND

The material facts, drawn from the Complaint and the parties' Local Civil Rule 56.1 Statements, are undisputed unless otherwise noted. Plaintiff became a police officer with the Town in 1985. (Def.'s R. 56.1 Stmt. ¶ 6.) Sarris was the Town's police chief and, as such, was the highest ranking member of the Town's police department. (Compl. ¶ 8.) Kevin Sarlo was the Town's police captain and, as such, was the "third highest ranking member of the Town Police Department." (*Id.* ¶ 9.) Michael Sarlo was a lieutenant in the Town's police department. (*Id.* ¶ 10.) Rickenbach was the mayor and a trustee of the Village. (*Id.* ¶ 11.) As the mayor, Rickenbach was the "highest ranking member of the Village." (*Id.*) Larsen was the chief of the Village's police department and, as such, was "the highest ranking member of the Village Police Department." (*Id.* ¶ 12.) Tracey was the Village's police captain and, as such, was the "second highest ranking member" of that department. (Compl. ¶ 13.) Schneider was a lieutenant in the Village's police department. (*Id.* ¶ 14.) Galeano was a Village police officer. (*Id.* ¶ 15.) It is alleged that Sarris, Kevin Sarlo and Michael Sarlo were "high-ranking official[s] within the Town" who were "policymaker[s] for the Town," and who were responsible for the Town's

2

administration and operation.  (*Id.* ¶¶ 8, 9, 10.)  Similarly, it is alleged that Rickenbach, Larsen, Tracey and Schneider were high-ranking members or officials within the Village who were "policymaker[s] for the Village," and who were responsible for the Village's administration and operation.  (*Id.* ¶¶ 11, 12, 13, 14.)  It is further alleged that Galeano was "a policymaker for the Village."  (*Id.* ¶ 15.)

Plaintiff resides in East Hampton, New York.  (Def.'s R. 56.1 Stmt. ¶ 1.)  Although Plaintiff states that he is presently married to Sviatlana Daniliuk, (Pl.'s R. 56.1 Counterstmt. ¶ P2), the parties agree that Plaintiff was previously married to his first wife, Lisa, for 17 years.  (Def.'s R. 56.1 Stmt. ¶¶ 3, 4.)  Larsen married Plaintiff's ex-wife, Lisa, on October 18, 2008, after Lisa and Plaintiff's divorce was finalized in February 2007, and Larsen's divorce from his prior wife was finalized in May 2007.  (*Id.* ¶ 44.)

Plaintiff states that prior to the finalization of his divorce, "Larsen and Tracey responded to a call from [Lisa] to . . . Larsen, reporting that an incident had taken place at the home of Plaintiff."  (Pl.'s R. 56.1 Counterstmt. ¶ P4.1.)  According to Plaintiff, although Larsen appeared "in a civilian capacity," he was wearing his uniform.  (*Id.*)  Plaintiff further states that Larsen went into his home while Tracey remained in Plaintiff's garage.  (*Id.*)  Plaintiff states that "[s]hortly thereafter, Larsen returned to the garage, but had changed clothes, although Tracey did not see him enter the home with any clothes."  (*Id.* ¶ P4.2.)  Plaintiff further states that "Tracey testified that it was his belief that Larsen was upset that Plaintiff was not arrested at [that] time, and that Larsen indicated he believed Plaintiff should have been arrested."  (*Id.* ¶ P4.3.)

"On August 23, 2007, [Plaintiff] went to Waldbaum in East Hampton to shop for

3

groceries."[1]  (Def.'s R. 56.1 Stmt. ¶ 7.)  "When [Plaintiff] left Waldbaum, he noticed a Dodge Durango parked in the street."  (*Id.* ¶ 8.)  "The vehicle was just sitting there."  (*Id.* ¶ 9.)  Plaintiff assumed that the Dodge Durango parked near the shopping center was the official police vehicle assigned to Larsen.  (*Id.* ¶ 10.)  "The Dodge Durango had privacy glass, [and] dark tinted windows."  (*Id.* ¶ 11.)  Plaintiff observed an individual in the Durango who he believed at the time to be Larsen, "but later learned . . . was not."  (*Id.* ¶ 12.)  Plaintiff was unable to identify the individual in the vehicle because of the vehicle's tinted windows.  (Def.'s R. 56.1 Stmt. ¶ 13.) "From the time [Plaintiff] left Waldbaums until he picked up his son at the barber shop and left that area, he never saw Larsen walking around."  (*Id.* ¶ 14.)  Plaintiff did not approach the vehicle to speak to the person inside of it.  (*Id.* ¶ 15.)

While walking up the street, Plaintiff observed "two Hispanic men sitting on a fence in the area of the bus stop."  (*Id.* ¶ 17.)  Plaintiff walked past the men and said "policia, black car down there."  (*Id.* ¶¶ 17, 18.)  After identifying the police to the men, Plaintiff walked to his car to wait for his son.  (*Id.* ¶ 19.)  Plaintiff later learned that one of the Hispanic men was police officer Galeano.  (Def.'s R. 56.1 Stmt. ¶ 20.)  Plaintiff also "subsequently listened to a tape or saw a transcript of a tape in which Officer Galeano translated to the other Hispanic man what Wood had said to them."  (*Id.* ¶ 21.)

Several days later, Plaintiff received a phone call from Schneider, of the Village police, advising Plaintiff that "he had committed obstruction of governmental administration and [that] they were initiating [an] action to arrest him."  (*Id.* ¶ 22.)  Schneider "requested that

---

[1] Although the Court quotes the parties' Local Civil Rule 56.1 Statements, the Court notes that the subject supermarket has been varyingly referred to by the parties as "Waldbaum" and "Waldbaums."

4

[Plaintiff] come into the station." (*Id.*) Plaintiff responded that he "needed to speak to a lawyer" first, and "refused to turn himself [in] without a lawyer." (*Id.* ¶¶ 23, 24.) "Over the weekend, [P]laintiff received calls from other members of the Village Police Department to turn himself in." (*Id.* ¶ 25.) On Monday, Plaintiff hired an attorney. (Def.'s R. 56.1 Stmt. ¶ 26.) Plaintiff's attorney arranged for Plaintiff "to turn himself in on Tuesday or Wednesday at the Village Police Department." (*Id.* ¶ 27.) While Larsen states that Detective Sergeant Dunn, Sergeant Deutschman, a detective and a secretary were present when Plaintiff turned himself in (*id.* ¶ 27), Plaintiff states that he did not clearly remember who was present at the police station because he had been suffering from anxiety, was sleeping erratically, and was on medication (Pl.'s R. 56.1 Counterstmt. ¶ P27).

Plaintiff was processed at the Village police station by a detective whose name Plaintiff did not know. (Def.'s R. 56.1 Stmt. ¶ 28.) Larsen had not participated in Plaintiff's processing. (*Id.* ¶ 33.) Subsequently, Plaintiff was transported by Sergeant Deutschman to the Town's Justice Court to be arraigned. (*Id.* ¶¶ 29, 30.)

"On the date of the incident, [Plaintiff] had assumed that the Dodge Durango was present because somebody wanted to watch him." (*Id.* ¶ 34.) However, "[i]t turned out [that Plaintiff] was wrong [and] [t]he presence of the Durango had nothing to do with [P]laintiff." (*Id.*) Plaintiff also learned that Larsen was not the person who had been in the Dodge Durango on the date of the incident because Larsen had been out of town, and, therefore, was not present. (*Id.* ¶ 32.) The person in the Dodge Durango was a different police officer. (Def.'s R. 56.1 Stmt. ¶ 32.)

Although the parties agree that Plaintiff did not have personal knowledge of any

5

communications between Larsen and the District Attorney's Office, including written communications, (*id.* ¶¶ 35, 36), Plaintiff states that he "testified that the information, which is provided to the District Attorney from the . . . Village Police Department, de facto comes from the Chief." (Pl.'s R. 56.1 Counterstmt. ¶ P35.) Plaintiff further states that "[p]ursuant to the rules and procedures followed by the police department[,] the Chief is ultimately held responsible for everything that went on there." (*Id.*) In addition, Plaintiff states that he saw a facsimile sent from Tracey to another individual referring to Plaintiff's arrest. (*Id.* ¶ P36.)

Larsen had been with the Village's police department for 24 years and had been promoted to the position of Chief in 2003. (Def.'s R. 56.1 Stmt. ¶¶ 39, 40.) Larsen had been assigned an unmarked, 2002 Dodge Durango. (*Id.* ¶ 41.) Plaintiff was aware that the Village utilized unmarked vehicles and that, prior to August 23, 2007, unmarked vehicles were used during undercover investigations. (*Id.* ¶ 37.) In August 2007, "there were undercover investigations at the train station every six months." (*Id.* ¶ 46.) According to Plaintiff, the undercover investigations were being performed at Larsen's direction, and Larsen "was ultimately responsible for the operations." (Pl.'s R. 56.1 Counterstmt. ¶ P46.1.)

Larsen states that "[i]n 2007, he directed Sgt. Griffis to send Mario Galeano to the train station to gather information about illegal hiring that was taking place because Galeano was fluent in Spanish." (Def.'s R. 56.1 Stmt. ¶ 47.) In addition, Larsen states that the specific reason Galeano was sent to the train station was "to see if day laborers were being exploited." (*Id.* ¶ 48.) According to Larsen, "[w]hen Mario Galeano went to speak to day laborers, somehow drugs came up and a meeting was set up at the park for [Galeano] to buy drugs from someone[,] and that is what Larsen was briefed on." (*Id.* ¶ 49.) Larsen states that since he "was leaving

Town, he approved their use of his vehicle." (*Id.*)  The parties agree that "[o]n the date in question, Galeano was there to do a drug investigation," and that Larsen was notified of that "prior to his leaving Town [for Manhattan] . . . on August 23rd." (*Id.* ¶ 50.)  Plaintiff states, however, that "[d]uring Galeano's conversation with the individual, [the individual] did not offer to sell [Galeano] drugs, drugs were never brought up in the conversation, and [the individual] was never a suspect." (Pl.'s R. 56.1 Counterstmt. ¶ P50.1.)

While Larsen states that, as far as he knew, a drug investigation had been performed, and that the next time he heard about the investigation was on August 25, 2007, and in the meantime he had been staying at a hotel in Manhattan, (Def.'s R. 56.1 Stmt. ¶ 51), Plaintiff states that as part of Larsen's job description as the police chief, Larsen was "to be aware [of] and ultimately responsible for what [went] on in the department," and, "thus, it [could] be presumed [Larsen would have been] informed of something out of the ordinary." (Pl.'s R. 56.1 Counterstmt. ¶ P51.)  Plaintiff further states that "Larsen testified that the charges against [Plaintiff] and his subsequent arrest were out of the ordinary" and "that he and Tracey [spoke] on a daily basis when [Larsen was] away." (*Id.* ¶¶ P51.1, P51.2.)

Although it is Larsen's position that on August 25th, Tracey called Larsen to notify him that charges were being brought against Plaintiff for his "interfere[nce]" with the police investigation, and that Tracey and the Mayor agreed not to involve Larsen in the matter, (Def.'s R. 56.1 Stmt. ¶ 52), Plaintiff states that, to the contrary, "Mayor Rickenbach testified that it was in fact Larsen himself who informed [Rickenbach] of the incident involving Plaintiff." (Pl.'s R. 56.1 Counterstmt. ¶ P52.)  Plaintiff further disputes Larsen's claims that he had no involvement with the incident, that "[n]o one asked [him] whether [Plaintiff] should be arrested,"

7

and that he "did not have any conversations with anyone in the Village prior to [Plaintiff's] arrest other than Captain Tracey." (Def.'s R. 56.1 Stmt. ¶¶ 53, 54, 55.) Instead, Plaintiff states that because Larsen was the Chief, and was to be notified when anything happened, "Larsen received a phone call while he was in Manhattan[,] informing him that [Plaintiff] would be arrested." (Pl.'s R. 56.1 Counterstmt. ¶ P55.1.)

Plaintiff disputes Larsen's claim that he did not speak with Galeano after Plaintiff's arrest (*id.* ¶ P56); however, the parties agree that, at some point in time, Larsen "told Galeano he did a good job," and that "Galeano was concerned that he was going to lose his house." (Def.'s R. 56.1 Stmt. ¶ 57.)

Tracey was the Village's police captain. (*Id.* ¶¶ 59, 60.) Tracey was "second in command" and directly subordinate to Larsen. (*Id.* ¶¶ 42, 59.) Tracey was not present at the scene of the incident on August 23, 2007. (*Id.* ¶ 61.) "He learned of the incident when Det. Sgt. Margaret Dunn reported it to him and to two lieutenants at the police station." (*Id.* ¶ 62.) Det. Sgt. Dunn had been present at the scene of the incident, and she reported to them "that a Town Police Officer blew their surveillance," which had involved the Det. Sgt. and two police officers, one of whom was wearing a wire while "attempting to purchase marijuana." (*Id.* ¶ 63.) Charges were brought against Plaintiff as a result of the incident, and the parties agree that Larsen did not physically handle the charges. (Def.'s R. 56.1 Stmt. ¶ 64.) Although Larsen states that "Tracey ordered the employees of the police department not to discuss the incident and charges against [Plaintiff] with Chief Larsen so that there would be no accusation of impropriety due to the relationship between [Plaintiff] and Larsen," (*Id.* ¶ 65), Plaintiff states that "Larsen was aware of charges against [Plaintiff] at some point prior to [Plaintiff's] arrest, and discussed the incident

8

with Tracey via telephone on August 25, 2007." (Pl.'s R. 56.1 Counterstmt. ¶ P84.1.) Plaintiff further states that "Rickenbach testified that it was in fact Chief Larsen who informed him of the incident." (*Id.* ¶ P65.) It is undisputed that "Tracey thought that if he permitted Larsen to have anything to [do] with the charges against [Plaintiff], he felt it would taint the case and not be proper." (Def.'s R. 56.1 Stmt. ¶ 66.)

Schneider is a lieutenant with the Village Police Department. (*Id.* ¶ 67.) Schneider "is not best buddies with Chief Larsen." (*Id.* ¶ 69.) Schneider became aware of the incident involving Plaintiff and Galeano when Detective Sergeant Dunn reported the incident to him, Lieutenant Long and Tracey. (*Id.* ¶ 70.) She said that while they were performing surveillance, Plaintiff "said that the 'policia' were over there." (*Id.* ¶ 71.) At some point in time, Detective Sergeant Dunn played a tape recording of the incident for them. (*Id.* ¶ 72.) According to Larsen, "[a]t that point, no one called [Larsen]" and "Schneider specifically remember[ed] Captain Tracey saying that he did not want the Chief to know about it." (Def.'s R. 56.1 Stmt. ¶ 73.) Plaintiff disputes Larsen's claim that "[t]he charges were filed before Larsen knew about what happened." (*Id.* ¶ 75; Pl.'s R. 56.1 Counterstmt. ¶ P75.)

At the time of the incident, "Galeano was talking to someone when [Plaintiff] approached the scene." (Def.'s R. 56.1 Stmt. ¶ 80.) Larsen states that Plaintiff approached Galeano and the individual, "and said 'policia' and looked over at the black vehicle and kept walking." (*Id.* ¶ 81.) According to Larsen, the vehicle was the Dodge Durango with tinted windows that was usually used by Larsen, but at the time of the incident was being used by a plain clothed detective to watch Galeano. (*Id.*) Plaintiff argues that he did not "gesture toward the Durango." (Pl.'s R. 56.1 Counterstmt. ¶ P81.) After Plaintiff walked away, the individual

9

who had been speaking with Galeano asked Galeano to translate Plaintiff's words. (Def.'s R. 56.1 Stmt. ¶ 82.) Galeano performed the translation and then walked away. (*Id.*)

At some point in time, Galeano had been asked to assist in bringing criminal charges against Plaintiff. (*Id.* ¶ 83.) Galeano spoke about it with lieutenants and detectives. (*Id.*) While Larsen states that Galeano did not speak with him about the incident, (*Id.* ¶ 84), Plaintiff states that "[p]ursuant to the rules and procedures followed by the police department[,] the Chief is aware of and ultimately held responsible for everything that [goes on]" and that "[o]n at least one occasion[,] Chief Larsen stated to Galeano that he did a good job in reference to [Plaintiff's] arrest, and he . . . may have done so the day after [Plaintiff's arrest] while he passed [Galeano] in a hallway." (Pl.'s R. 56.1 Counterstmt. ¶¶ P84, P84.3.) According to Plaintiff, Galeano testified that Larsen spoke with Galeano in the hallway of the police station a few days after Plaintiff's arrest and told Galeano that Galeano "did what [he] had to do. (*Id.* ¶ P84.4.) Galeano "gave a statement of what happened and signed Court information." (Def.'s R. 56.1 Stmt. ¶ 87.) Galeano "gave his statement to Det. Brown," and he also gave a signed statement to Det. Sgt. Dunn. (*Id.* ¶¶ 88, 89.) Galeano learned that charges had subsequently been filed against Plaintiff. (*Id.* ¶ 90.) A warrant for arrest was issued for Plaintiff and Plaintiff turned himself in. (*Id.*)

## DISCUSSION

### I.     *Summary Judgment Standards*

Summary judgment pursuant to Rule 56 is appropriate only where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates the absence of a genuine issue of material fact, and one party's entitlement to judgment as a

10

matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Consol. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252) (internal quotation marks omitted), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)) (internal quotation marks omitted), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted).

The district court considering a summary judgment motion must also be "mindful . . . of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925,

11

928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the "evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." *Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). "[W]here the nonmovant will bear the ultimate burden of proof at trial on an issue, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that his claim is not 'implausible.' " *Id.* at 211 (citing *Matsushita*, 475 U.S. at 587).

## II.     *Plaintiff Raises a Genuine Issue of Material Fact as to Whether Larsen Was Personally Involved in Plaintiff's Arrest*

Larsen asserts only one basis in support of his motion for summary judgment, i.e., that he was not personally involved in any alleged constitutional deprivation of Plaintiff's rights, and, therefore, he cannot be held liable to Plaintiff for damages. However, as discussed below, Plaintiff has come forth with sufficient facts to show that there is a triable issue as to whether Larsen was personally involved in Plaintiff's arrest.

"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 886 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). "[A] defendant who occupies a supervisory position may be found personally involved in the deprivation of a plaintiff's constitutionally protected [rights] in several ways," namely, through

12

his (1) direct participation in the violation; (2) failing to remedy the wrong upon learning about it through an appeal or a report; (3) creation of a custom or policy "under which unconstitutional practices occurred, or allow[ing] such a policy or custom to continue"; or (4) "grossly negligent . . . [management of] subordinates who caused the unlawful condition or event." *Wright*, 21 F.3d at 501 (quoting *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)) (internal quotation marks omitted). Notably, "personal involvement is a question of fact . . . [and] summary judgment may be granted only if no issues of material fact exist and the defendant[] is entitled to judgment as a matter of law." *Williams*, 781 F.2d at 323.

Plaintiff argues that because Larsen was the Village's police chief, "any information *de facto* [came] from Larsen, [and] therefore it can be assumed that Larsen was involved in communications with the Suffolk District Attorney regarding Plaintiff's arrest." (Pl.'s Mem. at 22.) Similarly, Plaintiff argues that according to the police department's rules and procedures, the Chief was ultimately responsible for everything that occurred within the police department. (*Id.*) Larsen, on the other hand, correctly argues that Plaintiff's claims are supported only by Plaintiff's own self-serving deposition testimony which, by itself, would ordinarily be insufficient to create a triable issue of fact. *See Deebs v. Alston Transp., Inc.*, 346 F. App'x. 654, 656 (2d Cir. 2009) (stating that self-serving deposition testimony, by itself, "is insufficient to defeat summary judgment"). Nonetheless, Plaintiff offers more than his own deposition testimony. Plaintiff offers the deposition testimony of the Defendants, including Larsen, to support his claimed factual dispute regarding Larsen's self-involvement in the alleged deprivation of Plaintiff's constitutionally protected rights.

Plaintiff argues that Larsen testified at his deposition that the undercover

operations were conducted under Larsen's direction and supervision, and that Larsen was "ultimately responsible" for the undercover operations. (Pl.'s Mem. at 22.) In response, Larsen argues that "the issue is not whether . . . Larsen was aware of an undercover operation in progress when plaintiff committed the offending acts which led to his arrest[, but rather] whether Larsen was involved in said subsequent arrest and prosecution." (Def.'s Reply at 2-3.) Larsen's assertion would be correct if his involvement could be established only by evidence of his direct participation in the unlawful acts. However, the law is not drawn so narrowly. As stated previously, participation of an individual in a supervisory position may also be established by showing that the individual: failed to remedy the wrong upon learning about it through an appeal or a report; created a custom or policy "under which unconstitutional practices occurred, or allowed such a policy or custom to continue"; or was "grossly negligent in managing subordinates who caused the unlawful condition or event." *Wright*, 21 F.3d at 501 (quoting *Williams*, 781 F.2d at 323-24) (internal quotation marks omitted). Thus, a supervisor, such as Larsen, may be held liable if he failed to remedy the wrong upon learning about it, or was grossly negligent in supervising his subordinates who caused the unlawful act. Plaintiff argues that the facts support both of these bases for liability. (Pl.'s Mem. at 23.) Construing all the evidence in favor of the non-movant Plaintiff, the Court agrees.

        Plaintiff offers the following additional facts, supported by the Defendants' deposition testimony, to show both that Larsen "fail[ed] to act on information indicating that unconstitutional acts were occurring, as he did nothing to stop the unlawful arrest of Plaintiff" and that Larsen's "failure to supervise his subordinates committing the wrongful acts against the Plaintiff, once Larsen became aware of them, was at the very least grossly negligent, if not

14

evidence of personal participation in the alleged violation": (1) Larsen's deposition testimony in which he testified that he was aware of the undercover operation before he left that same day for New York City; (2) Larsen's seemingly contradictory deposition testimony in which he testified that he talks to Tracey almost daily when he is away, but also testified that he did not learn about incident involving Plaintiff from Tracey until two days after it had occurred; (3) Larsen's deposition testimony that on August 25, 2007, prior to Plaintiff's arrest, Larsen learned about the circumstances surrounding the incident involving Plaintiff; (4) the fact that Tracey's deposition testimony that, after the incident, Tracey immediately advised Mayor Rickenbach not to discuss the matter with Larsen, contradicts Rickenbach's deposition testimony that Larsen was the individual who informed Rickenbach of the incident involving Plaintiff; and (5) Larsen's deposition testimony that after the incident, and possibly soon after the arrest, Larsen told Galeano he had "done a good job" with the arrest. (Pl.'s Mem. at 22-24.) Plaintiff asserts that these facts, combined with "Larsen's clear dislike and motive to harm Plaintiff, create triable issues of fact" as to Larsen's involvement in the alleged unlawful acts.[2]  (*Id.* at 24.)

In response, Larsen appears to address only the claimed inconsistent testimony of Rickenbach and Tracey. Larsen asserts that "no timeframe is established as to when [the] conversation" between Rickenbach and Larsen occurred during which Rickenbach first learned about the incident involving Plaintiff from Larsen. (Def.'s Reply at 3.) Larsen further asserts that he learned about the incident from Tracey two days after the incident had occurred. (*Id.*)

---

[2] Although Plaintiff does not provide a basis for his claim that Larsen had a "clear dislike and motive to harm Plaintiff," the Court presumes that Plaintiff's argument refers to Larsen's alleged "extra-marital [sic] affair with [Plaintiff's] wife. (Compl. ¶ 38.)

15

Thus, Larsen argues, "a subsequent conversation between Larsen and [Rickenbach] is not inconsistent with Tracy's [sic] [and Larsen's] testimony . . . that Larsen was not personally involved." (*Id.*)  Larsen's argument that the testimony is not inconsistent, however, is premised upon the assumption that the conversation between Larsen and Rickenbach occurred after the conversation between Larsen and Tracey; but, as Larsen admits, the timing of the conversation between Larsen and Rickenbach has not been established.  Therefore, Larsen's argument, which attempts to refute the claimed inconsistency of the testimony, is not based upon established fact, and, consequently, demonstrates the existence of triable issues of fact as to when Larsen became aware of the incident involving Plaintiff, and whether, as Plaintiff argues, the contradictory testimony shows that the "Defendants [were] covering up Larsen's actual involvement with Plaintiff's arrest." (Pl.'s Mem. at 23.)

Finally, Larsen argues that even if he was personally involved, he is nonetheless entitled to summary judgment because Plaintiff's arrest was lawful, and because there is no merit to Plaintiff's Sixth Amendment or substantive due process claims. (Def.'s Reply at 3.)  Larsen additionally argues that the Defendants are entitled to qualified immunity. (*Id.*)  In support of these arguments, Larsen directs the Court to the arguments asserted in the motion for summary judgment filed by the Village, Tracy, Schneider and Galeano. (*Id.*)  However, these arguments will not be considered by the Court as they are raised for the first time in Larsen's reply brief. *See Concepcion v. United States*, 181 F. Supp. 2d 206, 231 (E.D.N.Y. 2002) ("[I]t is well settled in the Second Circuit that a party may not raise an argument for the first time in a reply brief.").

Accordingly, since triable issues of fact exist as to whether Larsen was personally involved in the alleged deprivation of Plaintiff's constitutionally protected rights through his

16

failure to remedy the wrong once he became aware of it, or, alternatively, through his grossly negligent management of his subordinates who caused the unlawful conditions or events, Larsen's motion for summary judgment is denied.

## *CONCLUSION*

For the reasons stated above, Larsen's motion for summary judgment is denied.

**SO ORDERED.**

Dated: Central Islip, New York
January 7, 2014                  /s/
                                                Denis R. Hurley
                                                United States District Judge